IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
FILE NO.: 1:23-cv-50

| | | |
|---|---|---|
| MARLENE WILKERSON, | ) | |
|     Plaintiff | ) | FIRST AMENDED |
| | ) | COMPLAINT |
| v. | ) | RACE DISCRIMINATION |
| | ) | HOSTILE WORK ENVIRONMENT |
| | ) | CONSTRUCTIVE DISCHARGE |
| HENDERSON COUNTY, a body politic | ) | |
| organized and existing under the laws | ) | |
| of the State of North Carolina, | ) | |
|     Defendant | ) | |

Plaintiff files this First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).

**JURISDICTION AND VENUE**

1. Jurisdiction of this Court is pursuant to 42 U.S.C. § 2000e – 5(f)(3).

2. The employment practices alleged herein to be unlawful were committed within the jurisdiction of this Court.

**PARTIES**

3. The Plaintiff is a black female and is a citizen and resident of Buncombe County, North Carolina.

4. The Defendant, Henderson County, is a body politic organized and existing under the laws of the State of North Carolina. Defendant's Administration offices are located at 1 Historic Courthouse Square, Suite 2, Hendersonville, North Carolina 28792. Defendant employs in excess of one thousand employees.

1

5. The Defendant is a "person" and "employer" as those terms are defined in 42 U.S.C. §2000e (a) and (b).

6. The Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on July 7, 2021, which was within 180 days of the last act of discrimination by the Defendant as alleged herein. A Notice of Right to Sue was issued by the U.S. Equal Employment Opportunity Commission to the Plaintiff on December 1, 2022, a copy of which is attached hereto as Exhibit A.

**FACTS ALLEGED**

7. In February 2015 the Plaintiff was an employee of the Defendant and was promoted by the Defendant to a supervisor position in the Defendant's Social Services Department. In March 2015 the Plaintiff complained to the Administrator of the Social Services Department, Sandy Morgan, who was Plaintiff's supervisor, regarding conversations and rumors in the agency regarding Plaintiff being hired as a supervisor. The conversations were referred to as "town hall meetings". The conversations included that the Plaintiff was not qualified to be a supervisor; that she was a token; that she played the race card to get the position; that the quality of her work was subpar; that there were other more qualified candidates for her position; and that subordinates said that they would refuse to work on her team. The negative comments regarding the Plaintiff were racially motivated based on her being Black.

8. After Plaintiff's complaint regarding the conversations and rumors, Plaintiff's supervisor, Sandy Morgan, told Plaintiff that she had performed an investigation regarding Plaintiff's complaint. Morgan further told Plaintiff that the investigation was completed and stated: "I know what I am about to say will be upsetting to you, but everyone remembers that something was said, but no one can remember exactly what was said or who said it."

9. Plaintiff was extremely upset and believed that Morgan's investigation was inadequate in failing to determine or to advise Plaintiff who the participants in the so called "town halls" were, the purpose of such town halls, and specific comments that were made regarding the Plaintiff at the town halls. Morgan also did not advise Plaintiff what actions were to be taken to prevent further such town halls.

10. After the meeting, Morgan continuously asked the Plaintiff to identify the person who had told her about the town hall meetings. This was something that should have been determined by Morgan in her investigation. As a result of her belief that the investigation of her complaint by Morgan was inadequate, Plaintiff felt that no one in Defendant's administration was protecting her from false and damaging comments regarding her qualifications and ability to perform her job particularly when such false comments were totally based on her race. Morgan's only action following her investigation was a staff supervision meeting in which she discussed how workplace gossip needed to be handled rather than explaining that racially based comments regarding employees would not be tolerated.

11. As a result of Morgan's inadequate investigation and failure to assure that racial comments would not be tolerated in the workplace, Plaintiff feared that such comments would continue and that her ability to perform her job would be compromised as a result.

12. This is what happened and culminated with Morgan telling Plaintiff in March 2016 to come with her to a room where Defendant's HR Director, Jan Pritchard, was seated at a table. Morgan and Pritchard were the only two people in the room with the Plaintiff. Pritchard asked the Plaintiff, "Do you know why we are meeting?" When Plaintiff stated, "I have no idea", Morgan and Pritchard looked at each other with smirks. Pritchard then asked, "How is your team doing?" Plaintiff responded: "We are fully staffed, settling in, and learning policy." Pritchard asked, "Is there anything else?"

Plaintiff said "No". Pritchard and Morgan again looked at each other with smirks. Morgan then told the Plaintiff that she was under investigation. Plaintiff asked, "For what? Morgan said I cannot disclose that but Jerri McFalls, the Social Services Director, had approved the investigation and was being kept in the loop. Plaintiff responded: "Ok, what are you investigating?" Pritchard stated: "We believe you know" and Morgan stated: "Yes, we do." Plaintiff responded: "I have no idea what this is about." Pritchard said: "We are putting you on investigatory leave with pay and you will be escorted out of the building. While under investigation, you are not to speak to or have any contact with any Henderson County employee. You are not to go on any Henderson County property, such as, the library, courthouse, parks and so forth. Am I clear, do you understand what I have stated to you?" Plaintiff answered "Yes – what I hear you saying is not to communicate with any county employees or be on any Henderson County property until I hear back from you concerning my employment status." Morgan stood up to escort the Plaintiff out of the building and only allowed her to get her purse. Morgan instructed the Plaintiff as to which door and hallway she was allowed to walk through to exit the building and remained behind her giving verbal directions on exactly where to walk. Morgan escorted Plaintiff down the administrative hallway in front of her co-workers, down the stairway to the exit. When Plaintiff exited the building, Morgan made it obvious to anyone who could see that she was securing the door behind the Plaintiff. While Plaintiff was driving out of the parking lot, she saw Morgan and Pritchard staring at her from the office window.

13. The following day the Plaintiff was told by Morgan to come in for a meeting with Pritchard and the Social Services Director. At the meeting Plaintiff was told to return to work and that the investigation was closed. She was told that accusations that had been made against her were determined to have been false. No apologies were given to her for the false accusations, and she was not given any documents regarding the incident. Plaintiff was not advised at that time as to the basis for the investigation and her suspension.

4

14. Plaintiff was not able to return to work immediately because she had sought medical treatment from her physician due to devastating anxiety that she had experienced due to the shock, humiliation, and embarrassment of the previous day.

15. When the Plaintiff returned to work, Morgan told her: "We were trying to get you for reverse racism."  Morgan stated that they had been told that during Plaintiff's meetings with her staff, she would walk around the room and point her finger in each employee's face using threatening body language.  They reviewed video footage from Plaintiff's meetings in which she was observed to be sitting and conducting meetings with no signs of threatening body language.  Morgan also said they had been told that the Plaintiff used the word "urban".  She said they looked up the definition of urban and could not determine how the word could be used against her.  The Administrator also said that the County Manager had been told about the allegations against Plaintiff and that he had said "Get her out of here. We don't want a person like her working for the County." Defendant could have reviewed the videos and could have found the definition of urban without suspending the Plaintiff, restricting her from contacting any Henderson County employees, going on any Henderson County premises, and parading her out of the workplace.

16. After Plaintiff was promoted to her supervisor position in February 2015, she was racially disparaged in "town hall meetings" and was investigated and suspended based on false allegations of reverse racism. It is obvious that no effective action was taken by the Defendant after the February 2015 town halls since Plaintiff was accused of reverse racism in March 2016. Both actions resulting from rampant racism in Plaintiff's workplace were determined to be without merit.

17. In 2018 a white supervisor, Williams Purcell, with Defendant's Social Services Department was investigated for using derogatory racial terms, speaking to

5

Case 1:23-cv-00050-MR-WCM    Document 6    Filed 05/15/23    Page 5 of 11

female employees about their physical appearance, and talking about wearing a KKK costume on campus when he was in college. At a meeting where there was a discussion about what to do for an employee who was leaving, Purcell said, "We could take him coon hunting." Plaintiff was present at this meeting. On another occasion Purcell asked a Black female if her baby had learned the N-word yet. This information was reported to HR and the Social Services Director twice before any investigation was done. While this white employee was being investigated, he was allowed to stay on the job. He was not escorted off the property, he was not told to stay off all county property, and was not told to refrain from communicating with Henderson County employees. He was not escorted down the hallway in front of his co-workers and was not watched through county windows while driving out of the parking lot. This white male employee was not treated in the same manner as the Plaintiff had been based on similar allegations. This disparity in treatment intensified Plaintiff's belief that she was being treated in a discriminatory manner based solely on her being black.

18. As a result of having been falsely accused on two occasions with no effective action being taken by Defendant on either occasion to prevent recurrence of such charges, Plaintiff believed that her workplace was a hostile work environment due to the racism exhibited by her supervisor, management, and co-workers.

19. Based on her extreme fear of further workplace racist activity, Plaintiff always kept her car keys in her pocket and stayed alone as much as possible. She felt that she was under constant surveillance and that the workplace was rife with racial discrimination. In addition to the false charges made against her, Plaintiff observed that racially derogatory comments were frequently made in her presence in the workplace. Defendant was aware of the extreme racism in the workplace but took no action to prevent it.

20. Plaintiff's supervisor, Morgan, made frequent comments about Plaintiff's hair and skin in the presence of Plaintiff's co-workers. Morgan watched YouTube videos

6

about Black people's hair and questioned Plaintiff about the videos in meetings. The comments and questions by Morgan regarding Plaintiff's hair and skin were directed to Plaintiff because of her being Black.

21. Even though Plaintiff was in constant fear and anxiety in the workplace, she continued performing her job to the best of her ability. In March 2018 Plaintiff was promoted to Program Manager, a position in which she managed three (3) supervisors and 31 income maintenance workers. Several subordinate employees, including supervisors, became verbally aggressive toward Plaintiff in team meetings and engaged in blatant acts of insubordination. Plaintiff reported these incidents to the Social Services Director but no actions were taken regarding these incidents. Again, Plaintiff's complaint that she was being racially discriminated against was ignored with no action being taken by Defendant.

22. Plaintiff was the only Social Service administrative employee in a leadership position who was Black. All the White Social Services administrative employees in leadership positions were given offices with windows except Plaintiff. Plaintiff was not given a window office even though she had more seniority than the white employees who were given window offices. When Plaintiff requested that she be given an available window office, it was always given to a white employee.

23. In May 2021 a white co-worker showed Plaintiff a website showing salaries for Henderson County employees. This white co-worker, who was equal in seniority and held a comparable position to Plaintiff had a higher salary than Plaintiff. The white co-worker told Plaintiff that this was racism like she had never seen before.

24. Plaintiff supervised more employees than white program managers but was paid less wages even though she performed equal work on jobs the performance of which required equal skill, effort, and responsibility and which were performed under similar working conditions, than white employees of the Defendant who performed the

7

same duties under the same conditions as the Plaintiff.

25. The Plaintiff was discriminated against by the Defendant with respect to her compensation, terms, conditions, and privileges of employment because of her race.

26. The racial discrimination that Plaintiff endured while working for the Defendant has had multiple negative impacts on her life. She has suffered severe emotional and psychological injury as the result of being constantly in a state of mental anguish with feelings of fatigue, sadness, and anxiety.

27. The racial discrimination in wages that Plaintiff endured has negatively affected her income, retirement benefits, retention bonuses, and ledger account with Henderson County.

28. The conduct, as herein alleged, by the Plaintiff was unwelcome, was based on Plaintiff's race, was sufficiently severe and pervasive to alter the Plaintiff's conditions of employment and to create an abusive work environment and was imputable to Defendant.

## COUNT ONE
## HOSTILE WORK ENVIRONMENT DUE TO
## RACIAL DISCRIMINATION

29. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race. Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action. As shown in the preceding allegations, the alleged conduct based on Plaintiff's race, was unwelcome, was based on her race, was sufficiently severe and pervasive such as to alter the conditions of her employment

and to create an abusive work environment and was imputed to her employer.

30. Plaintiff communicated her objection to discriminatory treatment on the basis of her race to her employer on multiple occasions. In response to Plaintiff's complaints, the Defendant took no action to prevent continuing discriminatory treatment of Plaintiff on the basis of her race.

31. The discriminatory conduct in Defendant's workplace was so severe and pervasive as to create a hostile work environment both subjectively and objectively for the Plaintiff. The Defendant employer was aware of the hostile work environment and took no action to correct it.

32. Plaintiff is part of a protected class under Title VII and suffered an adverse employment action based on her race.

33. The elements of a Hostile Work Environment claim are the same under Title VII and 42 U.S.C. §1981.

## COUNT TWO
## UNLAWFUL DISCRIMINATION ON BASIS OF COMPENSATION

34. 42 U.S.C. §2000e-2(a) provides that it is an unlawful employment practice for an employer to discriminate against an individual with respect to his compensation because of his race or color.

35. The Defendant discriminated against the Plaintiff on the basis of race by paying wages at a rate less than the rate at which it paid wages to employees of the opposite race for equal work on jobs the performance of which required equal skill, effort, and responsibility and which were performed under similar working conditions.

9

## COUNT THREE
## CONSTRUCTIVE DISCHARGE

36. The circumstances of Defendant's discrimination against Plaintiff on the basis of race were so intolerable that Plaintiff was forced to resign from her position of employment with the Defendant. Such circumstances were so intolerable that any reasonable person would have resigned.

## DAMAGES

37. As a result of the Defendant's discrimination against the Plaintiff on the basis of sex, the Plaintiff has sustained monetary losses including loss of back pay, front pay, retirement benefits, retention bonuses, and ledger accounts.

38. Plaintiff is entitled to recover compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses as provided by 42 U.S.C. §1981a (b).

WHEREFORE, the Plaintiff prays the Court:

1. That the Defendant be enjoined from engaging in unlawful employment practices as provided in 42 U.S.C. § 2000e-5(g)(1);

2. That the Plaintiff be granted appropriate relief as provided in 42 U.S.C. § 2000e-5(g)(1);

3. That the Plaintiff be granted appropriate relief as provided in 42 U.S.C. § 1981a for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

4. That the issues of fact herein be determined by a jury;

10

5. That the costs of this action be taxed against the Defendant including attorney fees for Plaintiff's counsel pursuant to 42 U.S.C. § 2000 e-5(k);

6. That the Plaintiff be awarded such other and further relief as the Court deems just and proper.

This the 15th day of May, 2023.

THE MOORE LAW OFFICE, PLLC

By: _____
George W. Moore
Attorney for Plaintiff
P.O. Box 7602
Asheville, NC 28802
NCSB#: 3073
828-258-8053
george@moorelawasheville.com

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date served the foregoing Amended Complaint in the above-entitled action upon all other parties to this cause by depositing a copy of the same in a post-paid, properly addressed wrapper in a post office or official depository under the exclusive care and custody of the United States Postal Service addressed to Sean F. Perrin, 301 South College Street, Suite 3500, Charlotte, NC 28202-6037.

This the 15th day of May, 2023.

By: _____
GEORGE W. MOORE

11