IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:23-CV-00050-MR-WCM

| MARLENE WILKERSON, | ) | |
|---|---|---|
| Plaintiff, | ) | MEMORANDUM AND |
| v. | ) | RECOMMENDATION |
| HENDERSON COUNTY, | ) | |
| Defendant. | ) | |

This matter is before the Court on a Motion to Dismiss (Doc. 7) filed by Henderson County ("Defendant"). The motion has been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

I. Relevant Procedural Background

On March 1, 2023, Marlene Wilkerson ("Plaintiff") filed her original Complaint. Doc. 1.

On May 15, 2023, Plaintiff filed a First Amended Complaint. Doc. 6.

On May 26, 2023, Defendant filed the Motion to Dismiss along with a supporting memorandum. Docs. 7, 8. Plaintiff has responded, and Defendant has replied. Docs. 10, 11.

1

II. Plaintiff's Allegations

A. February and March 2015

Plaintiff is a Black female who was previously employed by Defendant.

In February of 2015, Plaintiff was promoted to a supervisor position in Defendant's Social Services department (the "Department"). Doc. 6 at ¶ 7.

The following month, in March of 2015, Plaintiff complained to her supervisor, Sandy Morgan ("Morgan"), about "conversations and rumors," which were referred to as "town hall meetings," that pertained to Plaintiff being hired as a supervisor. These conversations included statements that Plaintiff "was not qualified to be a supervisor; that she was a token; that she played the race card to get the position; that the quality of her work was subpar; that there were other more qualified candidates for her position; and that subordinates said that they would refuse to work on her team." Id.

Morgan later told Plaintiff that Morgan had performed an investigation, but that, while "everyone remembers that something was said," no one could remember "exactly what was said or who said it." Id. at ¶ 8.

Plaintiff asserts that this investigation was inadequate, and that the only action Morgan took following the investigation was to hold a "staff supervision meeting" that addressed the handling of "workplace gossip" but not the impropriety of racially-based comments regarding employees. Id. at ¶ 10.

2

### B. March 2016

Approximately one year later, in March of 2016, Plaintiff was called to a meeting with Morgan and Defendant's human resources director, Jan Pritchard ("Pritchard"). Id. at ¶ 12. During that meeting, Plaintiff was informed that she was "under investigation" and was being placed on investigatory leave with pay. She was instructed not to have contact with any of Defendant's employees and not to enter Defendant's property, "such as, the library, courthouse, parks and so forth." Id.

After the meeting, Morgan escorted Plaintiff past her coworkers and out of the building and "made it obvious to anyone who could see that she was securing the door behind" Plaintiff. Id.

The following day, Morgan told Plaintiff to come in for a meeting with Pritchard and "the Social Services Director." At the meeting, Plaintiff was told that the investigation was closed and that she could return to work. Id. at ¶ 13. She was also told that the "accusations that had been made against her were determined to be false," but she did not receive an apology, and was not advised as to the basis for the investigation and her suspension, or given any documents regarding the incident. Id.

When Plaintiff subsequently returned to work, Morgan told her that "we were trying to get you for reverse racism" and that there had been reports that Plaintiff used threatening body language during meetings with Plaintiff's staff

3

and had used the word "urban," but that video footage did not support those allegations and that "they" could not determine how the word "urban" could be used against Plaintiff. Id. at ¶ 15. Morgan also informed Plaintiff that "the County Manager had been told about the allegations against Plaintiff and that he had said 'Get her out of here. We don't want a person like her working for the County.'" Id.

Plaintiff contends that Defendant could have investigated the reports without suspending Plaintiff, restricting her from contacting Defendant's employees and entering Defendant's property, and "parading her out of the workplace." Id.

### C. 2018

Plaintiff alleges that at some point in 2018, a white supervisor, Williams Purcell, was investigated, including for using derogatory racial terms and speaking inappropriately about female employees' appearance. Plaintiff alleges that she was present at a meeting where there was a discussion about what to do for an employee who was leaving, to which Purcell said "we could take him coon hunting." Purcell, however, was allowed to stay on the job while he was being investigated and was not barred from County property or from communicating with Defendant's employees. Id. at ¶ 17.

In March of 2018, Plaintiff was promoted to program manager, managing three (3) supervisors and thirty-one (31) income maintenance

4

workers. However, "several subordinate employees, including supervisors, became verbally aggressive toward Plaintiff in team meetings and engaged in blatant acts of insubordination." Plaintiff reported these incidents, but no actions were taken by Defendant. Id. at ¶ 21.

Additionally, Plaintiff, the only "Social Services administrative employee in a leadership position who was Black," was not given a window office despite her requests and "even though she had more seniority than the white employees who were given window offices." Id. at ¶ 22.

### D. May 2021

In May of 2021, a white coworker showed Plaintiff a website that listed the salaries for Defendant's employees; the website indicated that this white coworker, "who was equal in seniority and held a comparable position to Plaintiff had a higher salary than Plaintiff." Id. at ¶ 23.

Plaintiff additionally alleges that she "supervised more employees than white program managers but was paid less wages even though she performed equal work on jobs the performance of which required equal skill, effort, and responsibility and which were performed under similar working conditions . . . ." Id. at ¶ 24.

### E. Unspecified Time Periods

Plaintiff's First Amended Complaint contains additional allegations, though it is unclear when Plaintiff contends that these actions occurred specifically.

For example, Plaintiff alleges that "racially derogatory comments were frequently made in her presence in the workplace," and that her supervisor, Morgan, "made frequent comments about Plaintiff's hair and skin in the presence of Plaintiff's co-workers" and watched videos "about Black people's hair and questioned Plaintiff about the videos in meetings." Id. at ¶¶ 19, 20.

At some unknown date, Plaintiff resigned from her position. Id. at ¶ 36.

### III. Legal Standard

When considering a motion made pursuant to Rule 12(b)(6), the Court, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff, determines "whether the complaint on its face states plausible claims upon which relief can be granted." Francis v. Giacomelli, 588 F.3d 186, 189, 192 (4th Cir. 2009); accord Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009).

The Court, however, is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Consumeraffairs.com, 591 F.3d at 255; see Giacomelli, 588 F.3d at 192. That is, while "detailed factual allegations" are not required, the

6

Case 1:23-cv-00050-MR-WCM   Document 12   Filed 10/06/23   Page 6 of 16

complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); accord Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); accord Consumeraffairs.com, 591 F.3d at 255. In short, the well-pled factual allegations must move a plaintiff's claim from conceivable to plausible. Twombly, 550 U.S. at 570; Consumeraffairs.com, 591 F.3d at 256.

## IV. Discussion

Plaintiff asserts claims of (1) hostile work environment; (2) unlawful discrimination based on compensation; and (3) constructive discharge. Doc. 6. Defendant moves to dismiss all of these claims.

Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.*, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . . " 42 U.S.C. § 2000e-2(a); see also 42 U.S.C. § 2000e-2(h).

### A. Hostile Work Environment

"An employer contravenes § 2000e–2(a)(1) by, inter alia, requiring an African–American employee to work in a racially hostile environment." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015). To make out a claim for a racially hostile work environment under Title VII, a plaintiff must show that: (1) the conduct to which he or she was subjected was unwelcome; (2) the harassment was based upon his or her race; (3) the conduct was sufficiently severe or pervasive to create an abusive work environment; and (4) there is some basis for imposing liability on the employer. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183–84 (4th Cir. 2001); see also Boyer-Liberto, 786 F.3d at 277 (A hostile work environment exists when a workplace "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.") (internal quotations omitted).

Here, Defendant argues that Plaintiff has not alleged "severe or pervasive" conduct sufficient to support this claim. See Doc. 8 at 2.

To satisfy this element, a plaintiff must demonstrate both that she subjectively perceived the conduct to be hostile or abusive, and that the conduct would be viewed similarly by a reasonable person. Harris v. Forklift Sys., Inc., 510 U.S. 17, at 21–22 (1993).

"Whether a work environment is objectively hostile depends on the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Southern v. AMain.com, Inc., No. 3:22-cv-00096-RJC-DSC, 2022 WL 1416427, at *2 (W.D.N.C. May 4, 2022) (quoting Harris, 510 U.S. at 23 (1993)); see also Strothers v. City of Laurel, 895 F.3d 317, 331 (4th Cir. 2018). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted).

Further, "[t]he existence of a hostile work environment cannot be predicated upon acts that are isolated or genuinely trivial," Carter v. Ball, 33 F.3d 450, 461 (4th Cir. 1994), and "rude treatment from coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable." Evans v. Int'l Paper Co., 936 F.3d 183, 192 (4th Cir. 2019); see also Jones v. Sun Pharm. Indus., Inc., No. 3:19-cv-566, 2020 WL 2501439, at *7 (E.D. Va. May 14, 2020) (granting motion to dismiss hostile work environment claim where plaintiff alleged that her manager was "noticeably rude" to her, directed his comments and his gaze only to male employees, and routinely failed to respond to plaintiff's emails but

9

responded to emails from male employees, and that she was terminated for a mistake that male employees had also made (but that did not result in the male employees' terminations)); Tims v. Carolinas Healthcare Sys., 983 F.Supp.2d 675, 681 (W.D.N.C. 2013) (plaintiff failed to state a claim for hostile work environment where the only specific example plaintiff alleged was that her supervisor told plaintiff that "snapping her fingers at" plaintiff was the "only way 'you people will listen'" and that "she had to watch Plaintiff carefully because 'y'all blacks are sneaky people' and are always trying to get around the rules"); Murphy v. Danzig, 64 F.Supp.2d. 519, 522 (E.D.N.C. 1999) ("Plaintiff's only evidence of a hostile working environment centers around a single meeting" where a supervisor "'berated' him for spending too much time on an EEOC case; (2) . . . accused him of not earning his salary; (3) . . . stated that 'you're black' and that 'you people' are used to being targeted; and, (4) . . . encouraged [him] to give up his rights as a union representative."); Nurriddin v. Bolden, 674 F.Supp.2d 64, 94 (D.D.C. 2009) (Plaintiff's attempt "to transform his challenges to discrete acts of alleged discrimination or retaliation (e.g., nonpromotions, denial of leave, and termination) into a hostile work environment claim by combining those events with a series of ordinary workplace difficulties" failed to show facts sufficient for a hostile workplace claim.); Webster v. Town of Warsaw, 66 F.Supp.3d 706, 710 (E.D.N.C. 2014).

Here, Plaintiff alleges that she heard rumors pertaining to her qualifications as a supervisor after she was promoted in February of 2015 (including that she was a "token" and had "played the race card"), that "racially derogatory comments were frequently made in her presence," that she was "parad[ed]" out of the workplace and suspended for one day because Defendant was "trying to get [Plaintiff] on reverse racism," and that her supervisor made frequent comments about Plaintiff's hair and skin in the presence of Plaintiff's co-workers. Doc. 6 at ¶¶ 7, 12, 15, 17, 19, 20. Plaintiff additionally asserts that, due to the environment within the workplace, she "always kept her keys in her pocket and stayed alone as much as possible." Id. at ¶ 19.

At the same time, Plaintiff's allegations indicate these events occurred over a number of years, during which Plaintiff remained employed by Defendant and received two promotions. Plaintiff's allegations also lack specificity at times.

Nonetheless, reading Plaintiff's allegations in the light most favorable to her, the undersigned is persuaded, at this stage of the proceedings that Plaintiff has alleged severe or pervasive misconduct sufficiently and that her hostile work environment claim should be allowed to proceed.

### B. Unlawful Discrimination Based on Compensation

In order "[t]o establish a prima facie pay-disparity case under Title VII, a plaintiff must demonstrate: (1) she is a member of a protected class, (2) she

11

was performing her job satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive." Sharkley v. Fortress Sys. Int'l, Inc., No. 3:18-cv-00019, 2020 WL 2220188, at *5 (W.D.N.C. May 7, 2020) (quoting Brinkley-Obu v. Hughes Training, 36 F.3d 336, 343 (4th Cir. 1994)).

Here, Plaintiff has alleged that a white co-worker "who was equal in seniority and held a comparable position to Plaintiff had a higher salary . . . ." Doc. 6 at ¶ 23.

However, Plaintiff does not identify her rate of pay, or her white coworker's position or rate of pay. Plaintiff also alleges generally that she supervised more employees that white program managers and performed equal work under similar conditions while being paid less.

Accordingly, Plaintiff has not made sufficient factual allegations to support a pay disparity claim. See Clement v. Spartanburg Steel Prods., No. 7:19-cv-666-MGL-KFM, 2020 WL 8713676, at *7 (D.S.C. Aug. 12, 2020) (recommending that motion to dismiss be granted and explaining that "plaintiff makes a conclusory allegation that his white co-workers do the 'exact same work,' but he fails to state what position he holds and what positions his white co-workers who are allegedly paid more than him hold"), *report and recommendation adopted*, 2021 WL 809428 (March 2, 2021), *affirmed*, 2021 WL 5563964 (4th Cir. Nov. 29, 2021) (unpubl.) (per curiam); Medeiros et al v.

12

Wal-Mart, Inc., 434 F. Supp 3d. 395, 415 (W.D. Va. 2020) (granting motion to dismiss pay discrimination claim where plaintiff "alleged generally that men earned more than similarly experienced and tenured women and earned raises more easily and frequently than did women" but did not allege "any facts to support her allegations, such as her rate of pay compared to men at Walmart" and "did not name or describe any similarly situated men who earned more than she did"); see also Michael v. Va. Dep't of Transp., No. 3:21-cv-764, 2022 WL 3569004, at *10 (E.D.Va. 2022); Nadendla v. WakeMed, 24 F.4th 299, 306 (4th Cir. 2022); but see Robinson v. Procter & Gamble Mfg. Co., No. 1:18-CV-133, 2019 WL 1005504, at *3 (M.D.N.C March 1, 2019) (denying motion to dismiss race-based pay disparity claim where plaintiff alleged she was paid less that a white employee despite having more experience and holding the same title and position and explaining that the "Fourth Circuit has explicitly instructed that 'evidentiary determinations regarding whether the comparators' features are sufficiently similar to constitute appropriate comparisons generally should not be made at' the motion to dismiss stage") (quoting Woods v. City of Greensboro, 855 F.3d 639, 650 (4th Cir. 2017), *cert. denied sub nom.*, City of Greensboro v. BNT Ad Agency, LLC, 583 U.S. 1044 (2017)).

### C. Constructive Discharge

"Constructive discharge may constitute an adverse employment action under Title VII." Griffin v. Maximus, Inc., No. 3:22-cv-477-RJC-DCK, 2022 WL 16951672, at *2 (W.D.N.C. Nov. 15, 2022) (citing U.S. Equal Emp't Opportunity Comm'n v. Consol. Energy, Inc., 860 F.3d 131, 143 (4th Cir. 2017)).

A plaintiff making a claim of constructive discharge must show "circumstances of discrimination [that were] so intolerable that a reasonable person would resign." Consol. Energy, Inc., 860 F.3d at 144 (quotation and citation omitted); see also Chapman v. Oakland Living Ctr., Inc., 48 F.4th 222, 235 (4th Cir. 2022). "Absent such intolerable working conditions, an employee is expected to remain on the job while seeking redress under Title VII (including for a hostile work environment claim). In other words, stating a claim of constructive discharge under Title VII requires more than is required to state a hostile work environment claim under Title VII." Webster v. Town of Warsaw, 66 F.Supp.3d 706, 708-709 (E.D.N.C. 2014) (citing Pa. State Police v. Suders, 542 U.S. 129, 147 (2004)).

Here, Plaintiff alleges that "[t]he circumstances of Defendant's discrimination against Plaintiff on the basis of race were so intolerable that Plaintiff was forced to resign from her position of employment with Defendant." Doc. 6 at ¶ 36.

However, Plaintiff also alleges that, while she was employed by Defendant, she received two promotions and was the only "Social Services administrative employee in a leadership position who was Black." Doc. 6 at ¶¶ 7, 21, 22.

Further, leading up to her second promotion, Plaintiff alleges that "[e]ven though" she was "in constant fear and anxiety in the workplace, she continued to perform her job to the best of her ability." Id. at ¶ 21. Plaintiff has not disclosed when she resigned or provided further details regarding the circumstances surrounding her resignation. The undersigned will, therefore, recommend that this claim be dismissed.

## V. Recommendation

For the reasons set forth above, the undersigned **RESPECTFULLY RECOMMENDS** that Defendant's Motion to Dismiss (Doc. 7) be **GRANTED IN PART AND DENIED IN PART**, as follows:

(1) That Plaintiff's claims for unlawful discrimination based on compensation and constructive discharge be **DISMISSED**; and

(2) That Plaintiff's hostile work environment claim be allowed to proceed.

Signed: October 5, 2023

W. Carleton Metcalf
United States Magistrate Judge

15

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636, and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).